Feel free to start whenever you're ready. Good morning, your honors. My name is Catherine Windsor and I represent Johnny Stewart in this matter. Mr. Coleman and I have discussed dividing our time in half, so I'll take 10 minutes and I'd like to reserve two for rebuttal. My client is the Stewart brother who went to trial primarily to contest the aggravated identity theft counts. His position from the first was that he had not known that the identities that were used belonged to real people. And the government was equally adamant that any negotiated settlement would have to involve a plea to the aggravated identity theft counts. And that dispute led to a number of issues that we raised in the brief, including the issues that he had with his appointed counsel and obstruction of justice for suborning perjury. But I thought what I would start with was the sufficiency on the aggravated identity theft counts, unless the court wants me to address these issues. No, that's actually what I would be very interested in also. And at least one of the pieces of evidence involves a tax return and a W-2 form. And at least in at least one other circuit, I believe it was the 11th, documents that involved the IRS were found to support an inference that it belonged to a real person because, you know, why else would you file a tax return? And it seems, I guess what I'm struggling with is it seems to me fair to start with the proposition that documents of that kind at least, in addition to things like Social Security numbers, mother's maiden name, addresses, and other personal information, belong to real people. And I guess I'm struggling with why that isn't sufficient, particularly in light of these IRS documents. Yeah, well, I, in it there's sort of this new world of identity theft where there's there's this the possibility of these synthetic identities that are created where somebody actually does have a Social Security number and an address and they have credit reports that are quite detailed. I mean, one of them even had a bankruptcy on them. They all, they look, when you're looking at these documents, to be very realistic. I mean, it was something I was shocked to discover, just looking at the record in this case, that somebody who's not real would actually have this detailed credit report. And who is not, in this, in our record, who are you saying is a completely synthetic person who has a real-looking credit report? Right, well, so the Jason Carbon is one of, it's Jason Carbon and Ramon Vargas who are charged, I think, in the first four overt acts of the conspiracy count. And both of those, the government didn't, you know, the government says that they, the agent at trial testified that he couldn't say that they were real or fake, but that he had not found them. And so, and the government attorney conceded in closing that most likely these were not real people. And yet, they, yet Jason Carbon had a credit score that was, you know, pretty good. I mean, not, he was, I can't remember, something in the high 600s, but he was good enough to get credit and to have a credit card issued in his name. But there were real people because they testified. Yes. And they said, this is me, that's my name, that's my address, that's my mother's maiden name, etc., etc., and my identity was stolen. So we know that, in fact, there were real people. Yes. So then the question is, what must be shown to allow a jury to infer that some of the people were actually real, including the ones that are sitting there testifying. And in most cases, I mean, sometimes it'll be clear. You know, you steal your aunt's identity. Yes. You know who your aunt is. Or you go to your next-door neighbor's house and they catch you digging through the trash to get their stuff. But in most of these cases, there has to be an inference. What would be sufficient, in your view, that was missing here? Well, I think, you know, the examples that the Supreme Court gave, and I think it was Flores-Figueroa, are very similar to that. They talk about the source, but here you buy a list, you buy a bunch of stuff from a bad person. Yeah. And you are indifferent to whether the people are real or fake. Right. So, presumably, you're quite happy if they turn out to be real. But what do you have to show to allow an inference that you knew that at least some of them were real? I think you have to have some kind of evidence of the sort that you were discussing, where you can, you know, you can tell that they got it from a specific person or from a specific source, that they themselves, that they were skimming credit card numbers at a restaurant. That sort of thing happens all the time, where, you know, we're... In most of these cases, you won't have source evidence. So you're just saying this is not a crime that can be proved very often, and that's that's the luck of the draw. But in other circuits, they've allowed things like a successful use on more than one occasion to test the identity. They've allowed things like IRS-related documents. Is that wrong? Well, I think, I And this is aggravated identity theft. It's not that the government can't prosecute these cases at all, but this is a two-year consecutive sentence that you're giving on top of the guideline sentence. And so it is... Because real people have been really harmed. Yes, and in this case, I mean, absolutely, there were, I think, six people who came in. And yet, there were also these synthetic people who, from the defendant's perspective, having received this information, you wouldn't have known the difference. Is it your position that the government must prove precisely which people were real, or only that some of the people were real? Let's say you have a list of ten. Do you have to prove that it's number four, or is it enough that you can demonstrate or allow the jury to infer that, you know, at least one of them was real? I think if you could prove knowledge of one real person, then that's what you need. I know you could. Is that required? Do they bear the burden to demonstrate a precise real individual whose identity was stolen, or is it enough to prove that at least they knew that at least one of these was... If the person handing it over said, I'm selling you ten names and two of them are real people, but I'm not going to tell you which two, is that good enough? I think that's good enough. I just think you have to have some knowledge of real people, and that's what makes this aggravated identity theft statute different. And in this case, that point was also used for the finding that Mr. Stewart had suborn perjury for obstruction of justice, because his brother testified, you can't tell the difference when you look at these. Even the case agent, you know, can't tell. Law enforcement isn't going to be able to tell looking at these identities. And so that's the other error that we complain of, in addition to the sufficiency issue, is that this was not an appropriate finding for suborning perjury. There was another one as well, that his brother's denial that he'd spoken to the inspector, but that one really got cleared up. He ended up... The point of that was whether the inspector could identify his voice on the telephone calls, and in his testimony he admitted that, yes, that was my voice on the examination, so it wasn't something that my client elicited from his brother. So that's the other part of that issue of aggravated identity theft. And the other issue, of course, was all this, the conflict with counsel, which I think is pretty well laid out in the briefs, and I wasn't going to go into that. In addition, the other issue that we raised... Well, I guess I should just say that we both agree that there was an error with restitution, so there's that. And so unless there's any other questions, I think we're good. Good morning, my name is Ben Coleman, I represent Clayton Stewart, and I'll watch the clock and try to save some time if I'm able. I want to focus on our Sixth Amendment claim, and I thought I'd start with the standard of review, then get to the merits, whether this was a critical stage of the proceedings, and then talk about remedy. With respect to the standard of review, I think there's a little bit of a conflict in this Court's precedent about how you apply, whether you apply plain error or de novo review when you're talking about a claim structural error. I'm not sure it ultimately makes a difference in the case, but Hamilton, which is the case that we relied on in our briefs, seemed to suggest that you just apply de novo review if you're making a claim of Here's my question for you about, and I'm going to, for purposes of my question, the standard review also doesn't exactly matter. Why is this a stage of Clayton's trial at all? Clayton pleaded guilty, and before he was sentenced, he went and testified at his brother's trial, which is a separate trial. It's not Clayton's trial, and let's assume for purposes of argument that he has perjured himself, and then he gets sentenced. Why is that any different than he pleaded guilty, he goes out and robs the 7-Eleven, he comes back for sentencing, and the Court says, whoa, there's been more bad activity, so we're going to maybe enhance your sentence in some way for that. I guess I have difficulty seeing why it's his trial at all, critical or otherwise. Well, I think this Court has made it clear that the right, the 6th Amendment right, doesn't magically stop at a guilty plea. No, but a witness does not have a right to a lawyer. Let's say he wasn't charged with anything, and he came in and perjured himself at his brother's trial, and I know you don't concede that he perjured himself, but just for the purpose of advancing the conversation, he doesn't have a right to a lawyer during that time as a witness under, as I understand our precedent. Do you agree or disagree with that? Some Unless somehow the brother's completely separate trial is a part of his proceedings, I don't see where the 6th Amendment even gets into it. Well, I mean the 6th Amendment gets triggered when you're indicted and you make an appearance before the Court. As to your own proceedings, of course that is true, but that's why I'm saying to me it almost looks like he committed a crime between the time he pleaded guilty and the time he was sentenced. It happens that the crime involved his brother and testimony, but it could just as easily have involved, you know, as I say, you know, theft at a 7-Eleven or beating up a household member or whatever. It's only happenstance. It's not really part of his trial. I guess I have difficulty seeing that. Well, I mean obviously you don't have the right to counsel when you go to the 7-Eleven. The right to counsel is the same indictment, the same case number. He's a pending sentencing. The court, by process, he's brought in under a subpoena to testify when you're robbing a 7-Eleven. There's no court process that's... I thought he was voluntarily appeared. No, he was subpoenaed to testify. So there's court process compelling his testimony and at that point, while his sentencing is pending in the very same case, it's our position that it's a critical stage of the proceedings. You know, this court has extended the Sixth Amendment right past the guilty plea. It includes, you know, meeting with a prosecutor or potentially meeting with a prosecutor to cooperate. I mean, it includes, just as recently as earlier this summer, a victim getting up on, getting up before a court, a sentencing court and making a statement. It's our position that, frankly, the law, that this comfortably fits within this court's Sixth Amendment jurisprudence as a critical stage of the proceeding. Well, I think there's merit to your argument, but I guess I find the standard of review to be critical here because I'm inclined to think it is plain error review and I don't think you could meet the first prong, which is that this error was obvious. To me, it's not obvious in light of existing precedent, even as of today, that counsel should have, or it's more that he should have taken a waiver, I guess, that the judge should have taken a waiver if counsel was not going to be there. That might be a logical extension of current case law, but it wasn't something that I could say, District Judge, this was so obvious you should have spotted it on your own without an objection. So, maybe you could respond. Well, obviously, we would urge the court to apply de novo review and to follow Hamilton. I mean, Hamilton is the first, when there's two, three judge panels who have issued opinions, the court is supposed to follow the first one. And in Hamilton, this court said, look, we don't apply plain error in this context, we just go de novo. So, we would ask you to go de novo and to agree with us. If you disagree with that and go to the plain error standard, it's our position that, you know, plain error, it's not like AEDPA review where you have to have a Supreme Court case and it has to be clearly established. There's more flexibility there. And it's our position that, in this case, this is a logical extension of the body of case law that this court, Leonti, which was the post-plea, you know, pre-sentencing cooperation phase, and Yamashiro, which came out this summer, is also instructive. And for plain error review, you have to take the state of the law at the time of appellate consideration. So, even if the law wasn't entirely clear when this happened, you look at the law as it exists today. And we think that this is a logical extension. And frankly, the chances of prejudice in this particular context is much greater to the defendant than what happened in Yamashiro. I mean... Here's a question about prejudice as well. Again, as I understand it, and I may be wrong, so please correct me if I have a factual misunderstanding, but I thought that Clayton's lawyer had explicitly already told him not to testify or to not... I can't recall now whether it's not to testify at all, or to take the fifth or whatever, and he just ignored the advice. Is that a correct recollection or not? That is a correct recollection. I would like to put a little bit of context to that, though. What the lawyer says at the beginning of the day of the trial where he's going to testify is that, I spoke to my client this morning and advised him to invoke, and he says he's going to testify. Later, at the sentencing proceedings, the district court judge says, I don't know why you did this. It was my understanding that you weren't going to testify, that you were going to invoke, and then at the last second, you changed your mind and decided to testify. So there seems to be, based on this record, this client who's been subpoenaed by his brother is struggling with what to do. And so if that lawyer had been present through the day, or at least at the time... So what could the lawyer have done? Let's just imagine the scenario of saying, I really want you to take the fifth and don't answer any of the questions, and he doesn't follow the advice. What does that lawyer do? He's not a party. He can't do anything, can he? Well, I guess that's what this court has said in its presence. It's hard when the lawyer's not there, it's hard to figure out what he would have or wouldn't have done or could have or couldn't have done. I'm not even saying would have. I'm saying what could you do if your client is a witness in somebody else's trial and you see them either answering questions they shouldn't answer or lying when you tell them that they shouldn't lie, what do you do? Well, certainly when the client, as he's being brought up to the witness chair, certainly at that point the client would have a right to say, you know what, Judge, I want to talk to my lawyer again. I've been on the fence on this. I want to help my brother, but my lawyer tells me it's a bad idea. I want another few minutes. He's in custody. It's not like this is a guy that can just call or meet with his lawyer whenever. There are restraints there. So he could have had that opportunity for a guy that appears to be struggling with what he's going to do all the way up until the time he hits the stand. Then even after he hits the stand, the defendant has a right if the question all of a sudden, he's like, well, I didn't anticipate that my brother was going to go here. I didn't anticipate the prosecutor was going to go there. The defendant has a right to say, Your Honor, I want to talk to my lawyer. The witness, I believe, does. Now the judge may say, look, that time the judge then has discretion to either say, you had that chance. We're not stopping this. We're going forward. Or the judge can say, all right, we're taking a break and allow that consultation. We don't know what would have happened. We can't know, and that's part of the problem. A lawyer who should have been there wasn't there. But I think there were things that I don't think it would have just been a mere formality that the lawyer would have just been sitting there like a lump of clay and nothing would have happened. The final thing on remedy, if I can just get to that. In Yamashiro, this court remanded to a different district court judge. I wasn't going to ask for that relief, but that point is moot because I believe the judge here just recently retired. So if the case were to go back, it would go to a different judge. It's our position that the remedy in this particular context, if the court agrees that there was a Sixth Amendment violation, is to restore the status quo ante, which means that there should be a resentencing without consideration of the trial testimony. Now, that may seem like it's a windfall to Mr. Stewart that he got on the stand, he did something wrong, he was presumably testified falsely, and he committed a new crime, as Your Honor was saying. But in the guilty plea context where defendants have argued that their lawyers were ineffective in advising on plea bargains and things like that, what the remedy is, is even if the defendant takes it to a trial, he could even testify at the trial, and all that happens, the remedy is we go back to the beginning, we go back to what happened before the trial in that case started or before, in this case, his testimony was given. So that's our position on what the remedy should be. Thank you, counsel. We'll add a minute or so extra, so we'll give them two total when they start. May it please the court, Alexander Schwab on behalf of the United States. I'd like to begin with what counsel for Johnny Stewart focused her argument on, and that's a sufficiency of the evidence in this case. I think much of the discussion can be clarified simply by explaining what was not the case here. First off, this was not a case in which there was a slew of utterly interchangeable identity information, some belonging to real victims, some belonging to synthetic identities that were otherwise not distinguishable. And secondly, this is not a case in which the actions of the defendants themselves treated those different profiles in exactly the same manner. Rather, this is a case in which of the Chase credit card business accounts that were opened in the names of various fictitious identities, there were, by my count, looking at trial exhibits two and three, and that can be found at the government's ER 496 to 98, ten credit card business accounts, and nine of them involved real victims information enlisting the primary account holder. And as the government's witness at trial explained, the primary account holder is the individual whose credit is relevant for opening up the account and getting that line of credit in the first place, as well as the person who then has authorization to authorize other users to join in on the account. And for that very same reason, given that the credit worthiness of those particular victims did matter, it's no surprise then that on the thumb drive that Johnny Stewart had hidden a toilet, he had credit reports revealing positive credit scores for those particular victims. Is counsel, is your opponent right that there were also credit reports for people who the agent wasn't able to verify are real? So the only credit reports I'm aware of, your honor, that belongs to a potentially fictitious identity is exhibit 105. I don't believe it's in the excerpts of record, but that one I was aware of, but she mentioned someone else. So I'm aware that profile information existed for those other individuals, but not a full-fledged formal credit report by a credit reporting agency. That is my, that is my knowledge of the record, at least. You mentioned that the person had a pretty decent credit score, in fact. I know about the Mathis one, because that's an alias for the defendant, right? Exactly, your honor. I thought she mentioned someone that, you know, has a real-looking credit report with an actual decent-looking credit score that your agent, when asked about that person, was, I can't, I can't verify that that person's real or not. So the cross examination of the case agent had to do with the investigation into the legitimacy of various identities, rather than the legitimacy of various identities with respect to particular credit reports. As far as I'm aware, there are no other credit reports that were gestured at during the trial, which is obviously the evidence that the jury was itself restricted to. And as your honor, sorry, as your honor brought up the Michael Mathis identity, it would make sense that of all the fictitious identities, the defendant would understand that that's a different one. This was an alias he was using as a witness at trial explained. So is your position that the existence of a credit report is circumstantial evidence that he was aware that these individuals were actual people? Absolutely, particularly credit reports as these were with positive credit scores. And that's why when you look at the First Circuit and the Eighth Circuit, they have case law on point explaining that one can draw an inference if one is obtaining credit reports looking into the credit worthiness of a particular identity and finds that it does have a positive credit history, that is strong evidence in favor of the inference that the person knew these were real people. So what cases, you said the Eighth Circuit, and what other circuits say that? The First Circuit. So that would be Valerio in the First Circuit referenced the existence of credit reports as strong evidence, and then Foster in the Eighth Circuit explained that real identities have higher credit scores, and a jury can draw a reasonable inference to say that someone who has obtained those credit reports with those high credit scores would have knowledge that those are, in fact, real victims. And in fact, just to note one other matter, Your Honor, the existence of the trial testimony of Clayton Stewart here, where Clayton Stewart claimed that, no, we didn't know any of these people were real victims, the fact that so much of that trial testimony was, in the words of the district court preposterous, could itself lead to an inference further bolstering the government's case here, that when he claimed we had no idea that any of these people were, in fact, real victims, that that was simply not credible whatsoever. But lack of credibility of a denial isn't affirmative evidence. If he had said we had no idea and the government put on nothing, the government would win. Yes, Your Honor, I think that wouldn't be adequate in and of itself, but I do think that this colored the ultimate analysis that was being given, that the credibility of the argument itself hinged on, that there was no knowledge itself hinged on a co-defendant whose word was, at the least, not credible in any slightest. Counsel, could we go back to the First Circuit case, Valerio? I thought that case said that the combination of a birth certificate and rely on the existence of credit reports alone. Am I misreading that case? No, that's entirely correct, Your Honor, that it's the combination of, there was a combination of credit reports and identity documents. Here, of course, there was a slew of false identity documents as well. But anything as cogent as a birth certificate in this case? I mean, here you have credit histories outlined for those individuals. You have real addresses for those individuals being used in the history provided to the lenders for opening up the small business accounts. And what you certainly didn't have, at least nothing cited. At least one tax return in W-2-4. That is correct, Your Honor, and I believe that can be found at, for example, GER 686, it's under seal, that tax return information that you have here. And again, going back, this isn't, again, a case in which the fake, possible fake identities and the real identities were used interchangeably. Rather, when you look at the small business accounts, nine of 10 belonged to real identities, not to these supposedly synthetic identities to which counsel for Johnny Stewart is referencing. What's the language in Foster that you're relying on to say that the existence of a credit score is sufficient to show knowledge that a real person is behind the identity? What's the language there? You know, unfortunately, I don't have the quote in front of me, but if I may reference the brief. Well, I'm kind of interested in the language from the case. I believe that this is, in fact, quoted in the government's papers. I thought, I mean, I'm looking at the language on page 1207 of Foster. I'm wondering if this is the language you're relying on. It says, a reasonable juror could also infer that the defendants as mortgage brokers knew that their scheme would be more successful if real identities were used because those real identities would be connected to actual credit scores. Yes, Your Honor, and I think while there's no evidence that these individuals were mortgage brokers, the sophistication of their scheme, their ability to create business accounts rather than just individual credit card accounts, and then the sophistication of the money laundering scheme, which itself involved separate fictitious businesses that they themselves developed, demonstrated their full-fledged knowledge of the credit system, the banking system as a whole, and could give rise to exactly the same inference as if they were, in fact, mortgage brokers. I have a question about the separation between the underlying bank fraud and the money laundering, because there is one of the arguments being made is that you can't have both of those if there's not a separate transaction. Yes, Your Honor. I think counts 18 and 20. When the deposits were made as distinct from the other acts, when there's a deposit into a sham account, what is the second transaction that occurs, in your view? So, first off, there's the bank fraud in obtaining these fraudulent credit cards. Well, okay, the credit cards. The credit cards that come with their line of credit, and that was in the name of one set of fictitious entities. Then, those credit cards were swiped, I believe it's counts 18 and 20, are swiped through the I-payment system, and funds are then deposited through that merchant payment system into it. And let me stop you there. And those are the proceeds, right? The funds that are deposited into the, is it the I-merchant account? I would disagree with you that those constitute proceeds in and of themselves. What are the proceeds that the subsequent transaction involves? The line of credit that is obtained from the bank. And just to be clear, this circuit's case law in Lameau, I'm not sure if I'm pronouncing that correctly, but L-O-M-O-W, says that the deposit of a fraudulently obtained check in a sham business is itself sufficient to... Yeah, no, I know. But under your theory, let's say I go to a bank and I fraudulently obtain a credit card. Under your theory, if I go to the ATM and I withdraw cash, I've just engaged in money laundering, right? I don't think it's the exact same as that. Arguably under... To me, just in trying to think through accounts 18 and 20, to me that, the hypothetical I just gave seems exactly the same, at least under your theory, as what you've alleged in 18 and 20. So how are they different? Well here, there's also the further insulation of the I-payment system. It's not going directly into the defendant's hands per se, but rather through this payment process, which incurs a fee, a fee that they'd only be willing to pay... I'm talking about your theory of what the proceeds are of the fraud, right? Because your response to Judge Graber's question was, well, or maybe it was to my question, the If that's true, then every single time I go to the ATM and I actually access that line of credit, according to your theory, I've engaged in money laundering. That seems to me plainly wrong, and I can't distinguish that hypothetical from what you've alleged in 18 and 20. So there's another layer of insulation. So even if one deems the ultimate payments from the credit card as the proceeds, what is received into the fictitious business entity accounts is those proceeds minus a surcharge imposed through the I-payment system. In other words, in order to convert the funds... Let's see if I understand this. So you're saying there's a separate financial transaction in essence because you are now not only taking the money, to use Judge Watford's hypothetical, but now you are transferring it or instructing the machine to transfer it somewhere else in exchange for your payment of a fee. And so that then counts as a second transaction. Is that right? Yes. And it's certainly relevant here that the entity into which it was depositing these funds was a bank account for a fictitious sham company, exactly the sort of company you would expect to be involved in a money laundering scheme. And it's exactly that sort of scheme that this court in Lameau was interested in, where an even simpler money laundering scheme, a far simpler money laundering scheme in which one took a fraudulently obtained check but deposited in a sham business's bank account, that was sufficient to support the claim. Are you saying that the second transaction involving the proceeds consists of the transfer from the I-merchant account into the checking account of the fictitious business? No, that would be the first layer of the money laundering fraud. I'm talking about for 18 and 20. I know for 19 and 21 you've got a second transfer into another fictitious business's account. I'm talking about for 18 and 20, as I understand it, but tell me if I'm wrong. You've got them, they swipe the card, the proceeds then go into the I-merchant account, and then they are automatically transferred into the actual checking account, and that's the only account that the defendants can actually access. Is that right? I'm not sure I can speak to their particular ability to access particular accounts, but I can say that, yes, your understanding counts 18 and 20 deal with the payment through the I-payment system into one fictitious entity's checking account. That's the money laundering at issue in counts 18 and 20. I don't see how that could be money laundering, because if the transfer from the I-merchant account to the checking account is the financial transaction that you're relying on to meet the elements of the statute, the defendants didn't conduct or attempt to conduct that transaction. It's just done, as I understand it, automatically, right? It's like by computer. So the swiping of the credit card through a credit card terminal that, via the I-payment system, deposits funds minus a surcharge into the fictitious entity's account, that's the And it's not a case in which the defendants walked out with their credit cards and just bought merchandise or took out cash advances in their own name. This is, instead, within the very heartland of money laundering, in which they took concerted efforts, efforts that, in fact, depleted the ultimate funds that they themselves received as profits from their scheme, in order to further insulate these funds from the initial bank fraud itself. And certainly... They're trying to get the money. They're not insulating anything. All they want, if they could have gone to the ATM and just gotten the money out that way, I'm sure they would have done that, right? They just want to access the money, and they're doing that by swiping the card, and then it eventually gets transferred in their checking account, and then they just take the money out. I would disagree with you, Your Honor, that simply enabling yourself better availability to the money means that somehow what would otherwise be money laundering no longer is. Rather, we have to look at whether there is a further transaction, whether that transaction promotes some sort of illegal activity here. And yes, this illegal transaction promotes the bank fraud as a whole by enabling them to better access to those proceeds and in a way that further insulates themselves from detection so that the scheme can continue to perform. Can I ask you one more question on this topic? I don't want to get too sidetracked on this. Let's say that we disagreed with you, as I'm inclined to do, on 18 and 20. I take it that that might not have any impact on the sentence. I don't know if you've thought through that, but I'm even wondering would it be necessary to remand for resentencing if we were to reverse the convictions on those two counts? I certainly could see no way in which it would impact the ultimate sentence inasmuch as sentencing guideline 2S1.1 still would be governing the base offense level here, and all the enhancements would apply as before. So the vacatur of those convictions I don't think would in fact lead to a remand because there would be no further proceedings with respect to the sentencing. Guidelines calculations would remain exactly the same, I take it, even if you took out those two counts? Exactly, Your Honor. I do want to address very briefly the argument for Defendant Clayton Stewart regarding his right to counsel at another individual's trial. And I think, Judge this was no more a critical stage in his proceedings than, say, his testimony, perjurious testimony at an unrelated civil proceeding to which he had been subpoenaed in advance of his sentencing and that a district court looked to as a reason to give him a harsher sentence under the 3553A factors. There was simply nothing that counsel could have done. In fact, the Supreme Court case law is pretty clear that when we're looking at whether one has a right to counsel, you're looking at what the function of counsel would provide. So when you look at the situation of, for example, the right to counsel during a psychiatric interview, you don't have that right to counsel, though you do have a right to counsel to consult with before that interview. Here, that right was in no way abnegated. Well, you, I mean, maybe you just haven't seen this happen at trial, but you're saying that if the defense lawyer, the lawyer for Clayton Stewart had been present for his testimony and he saw that, the lawyer saw that the questioning was getting into sensitive territory and maybe his client was starting to give answers that were bordering on the line of being perjurious, you don't think if the lawyer had said, Your Honor, could I please have a moment to consult with my client, that the judge would have told him no? I think he very likely could have told him no, and he would have been well within his rights to tell him no under a Supreme Court case law. I don't think that's true at all. I think the judge was shocked that the lawyer was there to protect the client. If the client starts getting into trouble, the lawyer can interject and say, Your Honor, I need a moment to consult with my client. I've certainly seen that happen. I guess maybe you haven't during trial. This witness was not the defendant at this trial. He was not a party to the proceeding. Right, but he's putting himself in jeopardy. That's why the judge, I think, was rightly shocked that you're really not going to be there when your client is going to testify about his involvement potentially in the exact same criminal enterprise that I'm about to But you don't think the judge would have been, sure, counsel, yeah, of course. You should probably consult with him, given what I'm hearing him start to say. I hesitate to speculate as to what the district court would or would not have done. However, under Perry v. Leek, it's pretty clear that a witness, while testifying, doesn't have the right, mid-testimony, to confer with counsel. And given that fact, even if the court might have, as an exercise of discretion permitted it, it certainly wasn't something that implicated any Sixth Amendment right to counsel, inasmuch as one has no right to confer with counsel at that stage period. The critical question is whether to testify, and Clayton Stewart had the benefit of counsel in making that determination. He ended up not following that advice, but he did have the benefit of that. And getting to the standard of review very quickly, you know, Hamilton was decided before a number of Supreme Court precedents on point, dealing with plain error review, and discussing how it's an open question whether structural error automatically necessitates a finding of prejudice, which by implication means that the plain error review, the other prongs do in fact still apply. In fact, in Yamashiro, which the defense cites in its 28J letter, that's precisely what was done by this court. The court did apply plain error review. Here, once again, there's no case that's even analogously on point here, except to the extent you look at the case law saying that one has no right to counsel during, say, a psychiatric interview or a pretrial interview. Thank you, counsel. Thank you, Your Honor. And you have a couple of minutes for rebuttal for your side. I wanted to start by clarifying the differences in the credit report, because I don't want to leave any misconception. The government really did, at this trial, focus on the real people, because they were the ones who came into court. And so the exhibits that we have in the record, with the really complete credit reports, are for the real people. And the credit report for the synthetic one, I'm aware of one that's in the record, well, two, Michael Mathis, and then I believe also there's these summary charts, and there may be more than one. But they weren't, the government, as far as I'm aware, did not enter full credit reports for this. You mentioned the credit report of someone who you said was not... For Jason Carbin, there's a summary credit report, but it's not the same type of, it's not the same level of detail that was in the record, in terms of, because Jason Carbin wasn't an account that the government was focusing on. So we don't have an actual credit report for that individual? I don't think in the record there is a full credit report. And that's what I wanted to clarify, because I don't want to leave that as a... I appreciate that. And, but I, what I would disagree with is this whole concept that other circuits have said that real people have better credit scores than these synthetic identities, because these synthetic identities were certainly good enough to get credit, and real people, of course, have bad credit as well. It's not, I don't think that's the, to me, that's not the power of the credit reports. A credit report with a good score does not in any way line up with it being a fake person, because fake people don't pay their bills on time, right? I mean, that's the, in terms of what the jury can infer from it, the power is that I have a credit report for somebody, and it's, they got an 816 credit score, and one of them was... One of them was really high, yes. And you look at the creditors on there, they're like real creditors. Bank of America, this person pays their bills on time. That's a real person. Right. Well, but the thing is, is that these synthetic people, I mean, I don't have that same credit report, but there's a credit score, and when the credit bureaus run their credit, there is that real score, and also real things on the credit report. I know, and there actually are very elaborate schemes creating actually high credit scores for totally synthetic people, but the jury never heard any testimony about that, I guess. There was never any expert testimony, so all they've got, they're looking at these real credit reports with high credit scores. I just don't see how under a sufficiency challenge the jury wouldn't be entitled to infer that that's, they must have known that that's a real, corresponds to a real person. Well, but real people don't necessarily, I mean, fake people have good credit and bad credit, and real people have good credit and bad credit. I mean, in fact, I would sort of think if you were going to create a synthetic identity, you'd probably create good credit for them. I mean, why wouldn't you? Because it's very difficult to do, right? You actually have to pay bills to real creditors to get that information recorded. That's a hassle. Well, I don't know how those high credit scores were created, if they're just done by some kind of computer process through the, you know, hacking into the credit bureaus. But there's no evidence of that. There's no evidence of any of this, and in fact, I mean, Mr. Stewart was representing himself, and so, you know, with a defense lawyer, some of these other credit reports may have been entered. But I want to clarify, they're not in the record, those full credit reports are not in the record. Thank you, counsel. The case just argued is submitted, and once again, we appreciate very much the arguments of all of you, and for this morning's session, we are adjourned.
judges: Graber, Rawlinson, Watford